## In re BAULDRY.

### No. 3847.

District Court, N. D. Iowa,
Central Division.

June 30, 1948.

Gareld Leming, of Hampton, Iowa, for petitioner A. S. Harris.

Harvey Uhlenhopp, trustee, of Hampton, Iowa, pro se.

W. W. White, of Iowa Falls, Iowa, for Cleo Bauldry, bankrupt.

GRAVEN, District Judge.

On Petition for Review. Case involving question as to whether contract relating to hogs gave rise to relationship of bailor and bailee or vendor and vendee.

On September 15, 1947, Cleo Bauldry filed in this Court his voluntary petition in bankruptcy. On September 16, 1947, he was by order of this Court adjudged a bankrupt, and the proceedings were referred to John H. Mitchell, the Referee in Bankruptcy for this district. Harvey H. Uhlenhopp was appointed trustee of the.

estate of the bankrupt. On March 1, 1948, following a hearing before the said Referee, the Referee entered an order determining a number of matters in connection with the said estate. Among other matters, the Referee determined that the bankrupt was entitled to the proceeds of the sale of seventy-seven (77) head of hogs being held by the Farmers Hybrid Seed Corn Company. A. S. Harris, a creditor of the said bankrupt, by petition has brought that portion of the said order before this Court for review. It appears that even including the funds now in question in the assets of the estate there would be insufficient assets to pay the claims allowed against the estate.

The said bankrupt at the time of the filing of his petition in bankruptcy and at the time he was adjudicated a bankrupt was a farmer engaged in farming near the Town of Popejoy in Franklin County, Iowa. The bankrupt was at the time and still is a resident of the State of Iowa and the head of a family. Section 627.6 of the Code of Iowa 1946 provides in part as follows:

"If the debtor is a resident of this state and the head of a family, he may hold exempt from execution the following property: * * *

"9. Five hogs, and all pigs under six months."

Under the Bankruptcy Act, 11 U.S.C.A. § 24, a bankrupt is entitled to have set aside to him as exempt that property which as to him is exempt from execution under the laws of the state of his residence. In Schedule B-2 of the petition in bankruptcy as filed by the bankrupt thereof, he listed as owned by him eighty-one (81) pigs under six (6) months of age. In Schedule B-5 of the said petition, the bankrupt claimed as exempt the pigs listed in Schedule B-2. Following the said adjudication of bankruptcy and between October 11, 1947, and November 10, 1947, seventy-seven (77) of the said hogs so listed and claimed as exempt were taken possession of by the Farmers Hybrid Seed Corn Company subject to determination as to whether the bankrupt or the trustee is entitled to the same. The proceeds amount to

$4917.10. At the time of the adjudication in bankruptcy, eleven (11) of the said seventy-seven (77) head of hogs were over six (6) months of age, and sixty-six (66) head were under six (6) months of age. The Referee in the order of March 1st, 1948, found and determined that five (5) of the eleven (11) head of hogs that were over six (6) months of age and all of the hogs under six (6) months of age were exempt to the bankrupt and that he was entitled to the proceeds thereof. The rights of the parties in and to the proceeds is the same as it was to the hogs in question at the time of the adjudication in bankruptcy. The Farmers Hybrid Seed Corn Company, hereafter referred as the Company, was and is a co-partnership which had and has its principal place of business at Hampton, Franklin County, Iowa. One of its business activities was and is to distribute hybrid seed corn. Sometime prior to December, 1946, the Company decided to undertake another line of business activity. That activity was to carry on a hog breeding program. As a part of that program, the Company entered into contracts with numerous farmers. On December 9th, 1946, the Company entered into a written contract with Cleo Bauldry. That contract was as follows:

"Hybrid Hog Production Contract

"Whereas, it is the desire of the Farmers Hybrid Seed Corn Company, to carry on a hybrid hog breeding program with farmers who have had outstanding experience and success as good hog producers, and with farmers who are interested to the extent that they will co-operate fully in a breeding program, and

"Whereas, it is the desire of the farmer producer to enter into a hog breeding program to the end that improved types and faster gaining hogs may be available,

"It is therefore agreed as follows:

"This Contract is herewith entered into by and between the Farmers Hybrid Seed Corn Company, a co-partnership, whose address is Hampton, Iowa, hereinafter referred to as the Company, and *Cleo Bauldry* whose address is *Popejoy, Iowa* hereinafter referred to as the Producer.

"1. The Company agrees to furnish the breeding stock to the Producer and the Producer agrees to make a cash deposit with the Company covering the value of said hogs at the local market price at the time he receives them and the Company agrees to furnish said hogs at that price, except the boar or boars which the Company is to furnish to the Producer without a cash deposit, and which boar or boars are to be removed from the premises of the Producer at Company's election.

"2. The title and ownership of all hogs and pigs and their offspring no matter how far removed, furnished by the Company shall be and remain in the Company absolutely.

"3. While the Company will exercise care in the selection of the breeding stock delivered to the Producer, the Company is not responsible for the breeding stock or the offspring.

"4. The Producer agrees to perform the following services and furnish the following labor and supplies as hereinafter set out:

"a. Producer agrees to grow and market these hogs under the direction of the Company.

"b. Producer agrees to furnish and supply such suitable facilities as directed by the Company such as buildings, lots, pasture, feed, and such care and labor as is in keeping with good swine husbandry.

"c. Producer agrees to fill out report forms which shall be furnished by the Company.

"d. Producer agrees that none of the hogs or their offspring are to be moved from the premises of the Producer only as directed by the Company.

"e. Producer agrees that no other hogs or pigs are to be raised on or brought onto the Producer's farm for any reason without the permission of the Company during the life of this agreement.

"f. Producer agrees that all pigs are to be vaccinated at the time designated by the Company with anti-hog cholera serum and hog cholera virus by a graduate veterinarian furnished by the Company at no cost to the Producer for the product used or the technical administration thereof. Any other veterinary service required or used is the responsibility of the Producer and such service is to be paid for by the Producer.

"g. Producer will be liable for any injury or damage done by any hog or pig included in this contract to any person or property, and will in every instance exonerate Farmers Hybrid Seed Corn Company from any liability whatsoever for such damage.

"5. In case the Producer neglects or fails to perform any of the conditions and terms of this contract on his part to be done and performed, then the Company is hereby authorized and empowered to enter upon said premises at any time and repossess said hogs and the increase, and the Producer to be paid the local market price as full settlement for said hogs or pigs in accordance with the terms as provided by this contract. The Company is also granted permission to enter on the premises of the Producer at any time and inspect said hogs, and all facilities pertaining thereto.

"6. The Producer agrees that all hogs, pigs and their offspring shall be settled for by the Company under the following terms:

"a. The Producer to receive the local market price, butcher grade, plus the value of fifty pounds (50 lbs.) per head as a premium for all boars raised by the Producer and selected by the Company for breeding purposes, not including boar or boars furnished to the Producer by the Company.

"The Company and the Producer agree that the Producer is to select the day in the month of October and the Producer is to notify the Company in writing which day he has selected as the day for establishing the base price for the boars he has produced for the Company, but in no case is the day selected to be a day that has passed. In case the Producer does not select the day and notify the Company in writing then the Company is to settle by paying the Producer based on the price of the last market day in October. The Producer agrees that the Company is to secure these boars at any date or dates selected by the Company, and not more than thirty days after the base price has been established.

"If fall pigs are produced under this contract then the Producer is to select the day in the month of April and the Producer is to notify the Company in writing which day he has selected as the day for establishing the base price for the boars he has produced for the Company, but in no case is the day selected to be a day that has passed. In case the Producer does not select the day in April and notify the Company in writing then the Company is to settle by paying the Producer based on the price of the last market day in April. The Producer agrees that the Company is to secure these boars at any date or dates selected by the Company, and not more than thirty days after the base price has been established. The price for all gilts selected by the Company for breeding purposes is to be the local market price established as the base price for the boars, but no premium in case of the gilts.

"b. For all hogs or pigs raised by the Producer under this contract and removed from the premises of the Producer by the Company, the Company is to settle with the Producer by paying the local market price at the time they are removed.

"7. It is mutually understood and agreed by the Company and the Producer that this contract may be terminated, voided and cancelled by either party by giving the other party a thirty days written notice that he so desires to terminate said contract, and it is agreed that on the receipt of said notice the hogs shall be settled for under the terms and in the manner as provided in this contract, and after said settlement and disposal of said hogs this contract shall be voided and cancelled.

"8. *Explanation of Cash Deposit.* The cash deposit is cancelled and nonreturnable to Producer when Producer delivers the hogs to the Company, and the Company settles by paying the local market price as defined in this Contract. Producer forfeits deposit on any hogs or pigs that die in Producer's possession.

"9. *Explanantion of Local Market Price.* Local Market Price is defined as the price on the day the transaction is made at which similar hogs in size, condition and grade are quoted at one of the three closest local markets, less the cost of trucking, provided the local market selected is in line with other markets in that area.

"10. This contract shall replace and supersede any and all previous contracts between these contracting parties.

"Dated this 9 day of December, A.D., 1946.

"Farmers Hybrid Seed Corn Company
"By (signed) V. B. Hamilton
"Partner
"(signed) Cleo Bauldry
"Producer

"This contract is made in duplicate and both parties do herewith receipt and acknowledge that each have received a copy of said contract on the date above written.

"Farmers Hybrid Seed Corn Company
"By (signed) V. B. Hamilton
"Partner
"(signed) Cleo Bauldry
"Producer

Under the above contract the Company furnished Cleo Bauldry with twenty-three (23) brood sows and otherwise performed the conditions on its part to be performed, and took possession of the pigs produced by the brood sows. As heretofore noted, the Company now holds the proceeds subject to determination as to ownership thereof. The contract between Cleo Bauldry and the Company was carried out by both parties in accordance with the provisions thereof. Therefore, there is not involved in this case the situation of a sham contract. It is the contention of the petitioner that the contract created the relation of bailor and bailee between Cleo Bauldry and the Company as to the hogs in question, that under it Cleo Bauldry was not the owner of the hogs in question, and that as a mere bailee he is not entitled to claim them as exempt property. The proceeds from the sale of them are hence claimed to be a part of the assets of the estate. It is the claim of Cleo Bauldry that the contract in question was in fact one of sale, that under it he became the owner of the pigs in question, and that as such owner he was entitled to claim them as exempt. Section 2 of the contract specifically provides as follows:

"2. The title and ownership of all hogs and pigs and their offspring no matter how far removed, furnished by the Company shall be and remain in the Company absolutely."

It is well settled that unless prohibited by statute or by rules of law parties are free to enter into any type or form of contract that they wish and to have it contain such provisions as they wish.

■ The stated purpose of the contract as expressed therein was to carry on a hog-breeding program. The primary objective of the contract as evidenced therein was the production for the Company, with compensation to the bankrupt therefor, of breeding boars of suitable quality. The secondary objective evidenced by the contract was the production for the Company, with compensation to the bankrupt therefor, of gilts suitable for breeding stock. The Company desired such production and engaged those who were able and equipped to carry on such a program.

It is undoubtedly true that the Company desired to sell or to rent for service, the particular boars and gilts selected by it from the produce created by the performance of the contract and that to conduct such a business was its ultimate objective in entering the contract with the bankrupt. This fact alone, however, would not seem to establish or tend to establish that the means by which such produce of boars and gilts was to be created or acquired was to be by carrying on a business of selling the sows, breeding them gratuitously, and repurchasing the entire offspring, whether or not such entire offspring were selected as being suited for rebreeding or not. Had such been the intention of the parties to the contract, it could easily have been so stated therein, and an option to purchase the suitable increase created. The supposed, although undisclosed, object of the reservation of title to the sows and their offspring in the Company would seem probably to have been to protect the Company's interest in the increase from landlord's liens or chattel mortgages incurred by the bankrupt. However, assuming this conjecture, it does not appear that by the contract any reservation of title was made or

interest created which in itself was unknown or repugnant to the law or to public policy. Likewise, such reservations in no way seem to be inconsistent with the objectives sought by the parties in entering the contract in the first instance. The Iowa Supreme Court stated in Holbert v. Keller, 1913, 161 Iowa 723, 142 N.W. 962, at page 967:

"There is no principle of law making it legally impossible for the owner of a chattel to consign or deliver it to an agent, factor, or broker for sale without creating the relation of seller and purchaser between the parties, and this is no less true if the consignment be made with a stipulation fixing the net price at which the agent shall account for it when sold or the manner and method in which the accounting shall be made."

Delivery to an agent for sale with a reservation of title in the owner, would seem to bear no material difference to the instant case in which delivery is stated to be for the purpose of producing and raising hybrid breeding stock. Possession without title, in either case, is entirely consistent with the respective objectives of the parties so contracting.

■ In view of the lack of repugnance of any legal status of possession or ownership created by the contract or performance of the parties under it, the true relation sustained by the parties by virtue of the contract would seem to be determined by the conditions imposed upon them by the contract as a whole. If, in the overall aspect, the duties, rights, and obligations of the parties under the contract are inconsistent with those of bailor and bailee, and appear more consonant with the relation of seller and buyer, regardless of the language used by the parties, the latter relation will prevail. The United States Supreme Court in passing upon the distinction between a sale and bailment contract in the case of Heryford v. Davis, 1880, 102 U.S. 235, at page 243, 26 L.Ed. 160, stated:

"What then, is the true construction of the contract? The answer to this question is not to be found in any name which the parties may have given to the instrument, and not alone in any particular provisions

it contains, disconnected from all others, but in the ruling intention of the parties, gathered from all the language they have used. It is the legal effect of the whole which is to be sought for. The form of the instrument is of little account."

Under such a rule, an analysis of the provisions of the contract and their relation and effect in substance upon the contractual relations and legal status of the parties created as a whole must follow, and, in the absence of fraud or other inequitable conduct, the freedom of the parties so to contract cannot be impaired by a strained or stilted construction opposed to their plain and unambiguous language.

In the last analysis, whether or not Cleo Bauldry became the owner of the brood sows furnished him, and of the increase thereof depends upon the balance of the attributes of ownership assumed by him over the swine acquired by virtue of the contract as against those incidents repugnant or inconsistent with the status of owner. If those incidents are of such weight as to show an inconsistency with the mere possession bestowed nominally by the contract, regardless of the reservations of the contractual clauses, his status in fact and in law is and will be declared that of owner of the hogs now in question.

Examination of the contract reveals several clauses which standing alone tend to create in Bauldry responsibilities generally associated with ownership. Paragraph Number 1 is probably the section of the contract which alone creates a strong inference of sale and standing apart tends to show that the parties intended title to pass upon such transfer of possession. Under the provision, the Company agrees:

"to furnish the breeding stock to the Producer and the Producer agrees to make a cash deposit with the Company covering the value of said hogs at the local market price at the time he received them and the Company agrees to furnish said hogs at that price, except the boar or boars which the Company is to furnish to the Producer without a cash deposit, and which boar or boars are to be removed from the premises of the Producer at Company's election."

Paragraph Number 3 would seem to strengthen an inference of ownership in Bauldry by a flat disclaimer of responsibility for loss of the breeding stock by the Company in not allowing under any circumstances a return of the deposit in the event of loss before the completion of the hog-raising project. That disclaimer is further extended in Paragraph Number 4, Section f, in which the Company rejects responsibility for any other than stipulated veterinary service. Disclaimer by the Company of financial responsibility to the party designated as the Producer is further joined in a denial of any liability of the Company for any damage done by the hogs or pigs "included in the contract" to any person or property, and the farmer-producer agrees that he "will in every instance exonerate Farmers Hybrid Seed Corn Company from any liability whatsoever for such damage," in Paragraph 4, Section g.

These assumptions of responsibility by the farmer-producer party to the contract are no doubt identical to those which would be assumed by any one entering the business of raising hogs for resale at a profit and who unquestionably purchased his own breeding or initial stock in trade. They are the risks and responsibilities naturally incident to the status of ownership. They would have been assumed by Bauldry, the bankrupt, had he purchased outright his own breeding stock with the intent to raise and sell them and their increase at a later date. However, it is not impossible for one in the status of bailee also to contract to assume each risk and responsibility shouldered by Bauldry in the instant agreement. It is quite competent for a bailee to contract to enlarge his common law liability without converting the bailment into a sale. In re Flanders, 7 Cir., 1905, 134 F. 560.

It would seem that the purpose of the Company in requiring such assumptions of responsibility by Bauldry although it reserved title to the subject matter in itself was twofold. First, there was every reason to give Bauldry all the incentive of a hog-owning entrepreneur, and there existed the practical necessity that a great deal of the control and care of the execution of the program rest in him as farmer-pro-

ducer. Secondly, except for the specific boars and gilts selected for rebreeding, the Company had no further interest in the hogs. As before noted, the primary objective of the contract was to produce hybrid boars for breeding purposes. Gilts suitable to be used as brood sows were also desired. As a coincident circumstance, the program to attain these objectives produced a by-product of very substantial value. That by-product was pigs or hogs not selected for rebreeding purposes. As to this produce, the Company had no purpose in assuming more than a nominal title. It, therefore, gave Bauldry every advantage and responsibility that an independent hog producer would incur in operating his business. The control and care the Company demanded for such hogs was obviously of a secondary and protective nature to those hogs selected as the primary objectives of the program. Hence, in effect as to the rest of the hogs, it had no reason to act under the contract other than as a channel through which that produce would move from the farmer to the market in the same manner and with the same profitability to the farmer as had he been the actual owner.

But Bauldry assumed obligations with his possession of the hogs furnished which were not consistent with the freedom usually attendant upon the status of ownership. Beyond the express and unequivocal reservation of title to "all hogs and pigs and their offspring no matter how far removed, furnished by the Company" in Paragraph Number 2 of the contract, the most striking features of the contract actually repugnant to the status of owner of the hogs are found in Paragraph Number 4. The Company retained the right to direct and supervise the methods to be used in raising the animals, to furnish certain veterinary services, and, in the event its requirements were not met, it was specifically empowered to repossess the hogs and their increase upon payment of the market price of the animals on that date. Bauldry's judgment and skill in the care of the hogs and methods to be used in raising their increase were to be relied upon generally by the Company, but they were subject at every instant of the duration of the agree-

ment to be superseded by the care and judgment deemed proper by the Company. He could not select the boars which would sire the litters he was to raise from the brood sows in his possession under the contract. That selection was made by the Company and received by Bauldry gratuitously. Although his deposit of the market value of the brood sows which were to be the initial breeding stock would indemnify the Company in event of their loss as to those sows, Bauldry himself had no actual choice or power of selection under the contract. He was to rely solely upon the Company's "care in the inspection of the breeding stock delivered to the Producer." He was required to submit the "hogs and all facilities pertaining thereto" to the inspection of the Company at any time and was to make reports concerning their general progress under the program in a manner provided by the Company. His failure to perform any of the contract-enumerated requirements subjected his possession to termination by the Company which would on such event pay him the market value of the hogs removed at such time. Bauldry was expressly restricted as to his power of alienation of the hogs possessed or their offspring. His judgment as to their marketing under the contract was limited to the selection of a day in the month of October or April, depending upon whether spring or fall pigs were to be produced, and turning the possession of the hogs and their increase over to the Company. He was unable to move any of the hogs or their offspring from the premises except as directed by the Company, and, indeed, was unable to allow the hogs involved to associate with any other pigs during the life of the agreement without the Company's express permission. It is believed that these requirements which Bauldry had to meet to continue possession are repugnant to the idea of an ownership interest in him.

The fact that the method chosen to remunerate Bauldry for his part in the breeding program was, in the same manner as is an independently-owning hog raiser's profit, interrelated to a great extent with market fluctuations and market values, undoubtedly makes the transfers of possession of the hogs resemble a sale and resale of the hogs

and their increase. The "market value" amounts which changed hands when Bauldry received the brood sows, and when the Company under ordinary circumstances would have repossessed them and their increase do bear a similarity to the "price" which changes hands when a hog-raising farmer buys his own brood sows and later markets them and their increase. The bonus paid for the selected boars is no doubt similar in appearance to the enhanced price the hog-raising farmer would receive for an animal considered of quality for breeding purposes. The simple fact is that no reason existed to alter this similarity. Beyond the breeding stock selected and the bonus to be paid for their production, the Company had no further interest in the hogs. The rest of the program was incidental to its purpose, and the profit to be gained or lost as to the swine not so selected was consequently left to the farmer who would ordinarily bear that risk anyway.

That the market price "deposit" amount was capable of commanding the sale or actual title transfer from owners of brood sows other than the Farmers Hybrid Seed Corn Company is here of little consequence. Whether Bauldry was wise or unwise in assuming contractual obligations and responsibilities by accepting possession only of the hogs is not here in issue. Whether either party made a good or a bad bargain in entering the contract is of little moment. The fact is that Bauldry agreed to perform a service for the Company in entering the contract. That service was to care for and raise hogs from which breeding stock could be selected. The Company expressly reserved and retained its title to the animals which would be used in connection with that service. It retained express controls over them and their offspring from the inception to termination of the contract. In the light of that express reservation of title coupled with the powers reserved by the Company under the contract, and, in the absence of any fraud or inequitable conduct of the parties, it is the view of the Court that it cannot be said that Cleo Bauldry was the owner of the hogs and the offspring

here involved, or that the parties ever intended that he should be.

To sustain the contention of the bankrupt that in reality the transactions embraced by the contract were sales of brood sows to the bankrupt, and that the deposit of the market price of those sows with the Company was in reality a transfer of a sale price by which title to the sows was vested in the bankrupt, would, in effect, be to hold that the Company generally, as to all farmers with whom it entered such contracts, and specifically, as to the bankrupt, was in the business of selling breeding stock. The further effect of sustaining the contention that the payment of the market prices by the Company at the times specified in the contract, when possession of the sows and their offspring was to be resumed by the Company, was in reality a purchase of the hogs by the Company, and a sale by the farmer with whom it had contracted, would, in effect, be to hold that the Company generally, as to all farmers with whom it had entered such contracts, and specifically as to the bankrupt, was in the business of buying pigs. An intention to carry on such a business does not appear among the avowed purposes of the contract as stated in the "whereas" clauses, nor is it necessarily to be divined from any section of the contract or from a consideration of the entire instrument as a whole. It is the view of the Court that the intention of the parties was, as stated in the contract, to carry on a program to produce breeding stock.

It is the holding of the Court that the contract between the Company and the bankrupt gave rise to the relation of bailor and bailee as to the hogs in question, that it did not give rise to the relation of vendor and vendee, and that as a bailee the bankrupt is not entitled to claim the hogs as exempt. It is the holding of the Court that the proceeds in question constitute nonexempt assets of the estate of the bankrupt and are subject to administration and distribution by the Trustee. Order and Judgment will be entered in accordance herewith.